IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVERETT KEITH THOMAS,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-CV-0441** |
| | : | |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

SÁNCHEZ, C.J.                                                    APRIL 23, 2021

Plaintiff Everett Keith Thomas, a pretrial detainee incarcerated at the Curran-Fromhold

Correctional Facility ("CFCF"), has filed an Amended Complaint raising constitutional claims

pursuant to 42 U.S.C. § 1983 based on assorted conditions of his confinement.  The Court will

dismiss all of Thomas's claims for failure to state a claim with one exception as discussed further

below.

## I.        FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

Thomas's initial Complaint named the following Defendants in their individual and

official capacities: (1) the City of Philadelphia; (2) the Philadelphia Department of Prisons; (3)

Commissioner Blanche Carney; (4) Major Gianetti, identified as the Warden of CFCF; (5)

John/Jane Doe, identified as "Commissioner of Operations"; (6) John/Jane Doe, identified as

"Deputy Commissioner of Operations"; (7) C/O Edwards, identified as a housing officer on B1-

Pod 2; (8) C/O Hester, identified as a housing officer on B1-Pod 2; (9) C/O John Doe, identified

as a housing officer on B1-Pod 2; and (10) Corizon Health Care Services ("Corizon").  In a

March 1, 2021 Memorandum and Order, the Court granted Thomas leave to proceed *in forma*

1

*pauperis* and dismissed his Complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  (ECF Nos. 9 & 10.)

The Court explained that Thomas failed to state a constitutional claim for several reasons. Many of his allegations concerning his conditions of confinement were vague and generalized, and his allegations that he was held in a multipurpose room, subjected to unsanitary conditions, denied showers, exposed to contaminated sewage water, denied visits from a social worker and placed in a room with a disabled emergency call button did not rise to the level of a plausible constitutional violation.  (ECF No. 9 at 4-7.)  Thomas also failed to state a claim for deliberate indifference based on his isolated allegation that he was not provided a COVID-19 test upon intake or based on vague allegations about eye strain and sick call slips that went unanswered. (*Id.* at 7-9.)  He also did not state a plausible claim for denial of access to the courts based on an inability to access the law library because he did not describe any nonfrivolous claim that he lost as a result of the denial of access.  (*Id.* at 9-10.)  The Court also concluded that, even if Thomas had alleged a constitutional violation, he failed to plead a basis for the Defendants' liability in either their individual or official capacities.  (*Id.* at 10-14.)  However, the Court gave Thomas leave to file an amended complaint in the event he could cure the defects in his claims.

Thomas returned with an Amended Complaint naming the following Defendants: (1) the City of Philadelphia; (2) Correctional Officer Edwards in his official capacity only; (3) Correctional Officer Hester in his individual and official capacities; (4) Correctional Officer John Doe of the "housing unit B1-Pod 2" in his individual and official capacities; and (5) Blanche Carney, Commissioner of the Philadelphia Department of Prisons, in her official capacity only. (ECF No. 19 at 1-4.)  Thomas alleges that from December 11, 2020 through December 26, 2020, he was housed in a multipurpose closet on housing unit B1-Pod 2.  (*Id.* at 7.)  During that time,

he alleges he did not receive showers or phone calls and did not have access to legal counsel. (*Id.*)

He alleges that Officer Edwards would "only open certain cells for recreation on the bottom tier" and would "turn off the emergency call button to ignore inmates in their cells and myself in the multipurpose closet." (*Id.*)  Thomas adds that Officer Hester, who worked the 3 p.m. to 11 p.m. shift on that unit, would also "turn off the emergency call button and leave the unit unattended for several hours which violates basic security protocols." (*Id.*)  Thomas adds that grievances were not given "by request" on the unit, and that he has yet to receive a response to a grievance he filed in December.[1]  (*Id.*)

On December 16, 2020, sewage water containing urine and feces from the housing unit flooded the multipurpose closet and a nearby cell. (*Id.*)  Thomas notes that Officer Hester finished his shift without feeding the inmates dinner, presumably on this date, although that is unclear. (*Id.*)  Officer Doe, who worked the 11 p.m. to 7 a.m. shift "[o]pened the multipurpose closet because of the flooding and left [Thomas and others] in the flooded multipurpose closet to go to lunch." (*Id.* at 8.)  When Officer Doe returned from lunch, he brought Thomas towels, a mop, and a bucket and instructed Thomas to clean the closet with toilet water. (*Id.* at 8.)  Thomas was not given gloves or cleaning supplies such as bleach. (*Id.*)  He was then served dinner in the "unsanitary multipurpose closet." (*Id.*)

At some point, Thomas was transferred to a multipurpose closet on another housing unit. (*Id.*)  He alleges that he has been sleeping "less than 36 inches away from an open toilet with 3

---

[1] Thomas does not tie his allegations about grievances to any Defendant.  In any event, as previously explained to Thomas, he may not state a claim based on the handling of grievances. *See* (ECF No. 9 at 13 (citing *Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005) (*per curiam*) (explaining that "[p]rison inmates do not have a constitutionally protected right to a grievance process.").)

other inmates thus exposing [him] to infectious diseases." (*Id.*)  He also avers that the unit has

been locked down several times because of inmates testing positive for COVID-19.  (*Id.*)

Thomas alleges that Commissioner Carney "knows or should know about the constitutional

violations" at CFCF "through reports" and because her office is located there.  (*Id.*)  He also

alleges that Carney acted with deliberate indifference in maintaining a policy that "directly

caused the reopening of the multipurpose closets which are illegal and not classified as a cell,"

and that caused four deaths at CFCF and assaults on staff by prisoners.[2]  (*Id.*)  Thomas also

contends that Carney, as Commissioner, "gives the orders and directs her staff in violating [his]

constitutional right" and "has and had knowledge of and acquiesced in her subordinate's

unconstitutional conduct."  (*Id.*)

Thomas alleges that he was injured in the form of insect bites on his chest and being

housed in "an illegal cell," and that he was "exposed to [unspecified] infectious diseases" when

forced to sleep less than thirty-six inches from an open toilet.  (*Id.* at 9.)  He seeks $5,000 for

each of the 106 days that he was housed in a multipurpose closet.  (*Id.*)

Thomas also filed several sets of exhibits, some of which are not legible because the

writing is too faint.  (*See* ECF Nos. 18, 20 & 21.)  Among the exhibits are sick call requests

submitted by Thomas to be seen for high blood pressure, glasses, and spider bites.[3]  (ECF No.

18.)  The exhibits also reflect that Thomas submitted requests to staff seeking to see a social

---

[2] Thomas does not allege that he was ever assaulted or at risk of being assaulted.

[3] Although some of Thomas's exhibits concerned requests for medical care, the Court does not understand Thomas to be pursuing claims for deliberate indifference to his medical needs because he does not discuss any medical needs, raise any allegations about medical care, or describe any of the Defendants' roles in matters related to his medical needs.  Thomas also appears to have abandoned his claims based on lack of access to the law library.

worker, and grievances about some of the conditions discussed in his Amended Complaint.

(ECF Nos. 20 & 21.)

## II.      STANDARD OF REVIEW

As Thomas is proceeding *in forma pauperis*, 28 U.S.C. § 1915(e)(2)(B)(ii) applies, which

requires the Court to dismiss the Amended Complaint if it fails to state a claim.  Whether a

complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard

applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher

v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether

the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).

Conclusory allegations do not suffice.  *Id.*  As Thomas is proceeding *pro se*, the Court construes

his allegations liberally.  *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

## III.      DISCUSSION

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

Since Thomas is a pretrial detainee, the Fourteenth Amendment governs his claims.  *Hubbard v.

Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  To establish a basis for a Fourteenth Amendment

violation, a prisoner must allege that his conditions of confinement amount to punishment.  *Bell

v. Wolfish*, 441 U.S. 520, 538 (1979).  "Unconstitutional punishment typically includes both

objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).

"[T]he objective component requires an inquiry into whether the deprivation was sufficiently

serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted).

Only conditions of confinement that "cause [detainees] to endure genuine privations and hardship over an extended period of time" violate due process. *Bell*, 441 U.S. at 542. Additionally, "a 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.'" *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68); *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017). Courts should consider the totality of the circumstances in evaluating such a claim. *Bistrian*, 696 F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution.").

To satisfy the subjective component of the analysis, a prisoner must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *see also Wilson v. Burks*, 423 F. App'x 169, 173 (3d Cir. 2011) (per curiam) ("'[T]he official must both be aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw that inference.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *cf. Edwards v. Northampton Cty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (per curiam) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (internal citations omitted)); *Coleman v. Hodges*, Civ. A. No. 18-1152, 2018 WL 6618459, at *5 (W.D. Pa. Nov. 30, 2018), *report and recommendation adopted*, 2018 WL

6

6618408 (W.D. Pa. Dec. 18, 2018) ("[T]he minimal scienter requirement under a Fourteenth Amendment conditions of confinement claim appears to be deliberate indifference"). Additionally, to be individually liable, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Iqbal*, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

As noted above, Thomas has only sued two Defendants in their individual capacities — Defendants Hester and Doe — while the remainder of his claims are against the City of Philadelphia or the Defendants in their official capacities. For the following reasons the Court will dismiss Thomas's claims with the exception of his claim against Defendant Doe based on the exposure to sewage water on December 16, 2020.

## A. Claims Against the City of Philadelphia and the Defendants in their Official Capacities

Thomas raises claims against the City of Philadelphia and all the Defendants in their official capacities. Official capacity claims are indistinguishable from claims against the entity that employs the officials. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690, n. 55 (1978)). Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* Since Thomas's official capacity claims against employees and officials of the City of Philadelphia are essentially the same as his claims against the City of Philadelphia, the Court will analyze these claims together according to the standards for pleading a municipal liability claim.

To plead a basis for municipal liability under § 1983, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights. *See Monell*, 436 U.S. at 694. "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009). "'Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "'Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For a custom to be the proximate cause of an injury, the Defendant must have "had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and . . . [this] failure, at least in part, led to [plaintiff's] injury." *Id.* (internal quotations and alterations omitted).

Thomas does not tie many of the conditions of which he complains to a municipal policy or custom in any way. The one possible exception is Thomas's allegation that Defendant Carney, as Commissioner of the Philadelphia Department of Prisons and presumably a municipal decision-maker, maintained a policy of "reopening" the multipurpose closets for housing inmates, even though the closets "are illegal and not classified as a cell."[4]  (ECF No. 19 at 8.)

---

[4] Thomas's other allegations about Carney, such as that she "knows or should know about the constitutional violations" at CFCF, generally directed staff to violate the constitution, and "has and had knowledge of and acquiesced in her subordinate's unconstitutional conduct" (ECF No. 19 at 8) are conclusory and, thus, not entitled to any weight. This means that Thomas has not plausibly tied any of the other conditions described in the Amended Complaint to a municipal policy or custom. Notably, Thomas has unsuccessfully relied on similar allegations in the past to pursue claims against the City. *See Thomas v. City of Philadelphia*, 779 F. App'x 99, 102 (3d

The alleged policy of housing inmates in multipurpose closets led to Thomas being housed in a multipurpose closet, rather than a cell, for 106 days, most of which were spent sleeping less than three feet from a toilet.[5]

  Housing detainees in a multipurpose area does not violate the constitution, even when an inmate is required to sleep in relatively close proximity to a toilet for a period of weeks or even months. *See Hubbard v. Taylor*, 538 F.3d 229, 232-35 (3d Cir. 2008) (triple-celling of pretrial detainees, some of whom were made to sleep on floor mattresses for three to seven months next to a toilet, which they claimed exposed them to disease, and housing of detainees in gym, weight room, and receiving area due to overcrowding, did not amount to punishment); *Wilson v. Wolfe*, Civ. A. No. 19-2405, 2019 WL 5862201, at *3 (E.D. Pa. Nov. 7, 2019) ("Housing inmates in multipurpose areas does not, without more, amount to a constitutional violation."). Thomas also alleges that he was denied showers, phone calls, and access to counsel for fifteen days in the first multipurpose room, although those appear to have been one-time deprivations and nothing suggests that these alleged deprivations stemmed from a municipal policy or custom. He notes that there have been four deaths in the institution and numerous assaults on staff, but he does not tie this allegation in any meaningful way to his own alleged experience being housed in a multipurpose closet (the alleged municipal action in question) or to a plausible risk to his own health or safety. Although he also indicates that the unit has been locked down on occasion because of inmates testing positive for COVID-19, he does not describe inhumane conditions as

---

Cir. 2019) (*per curiam*) (Thomas failed to plead knowledge of alleged constitutional violations by municipal decisionmaker when he claimed that the "City of Philadelphia knows or should know of the constitutional violations occurring in its prison[.]").

[5] Thomas's allegations about sleeping near a toilet appear to relate to the second multipurpose closet in which he was housed.

a result or suggest that the lockdowns were implemented for the purpose of punishment rather than controlling the spread of a contagious and serious virus.  In describing his injuries, Thomas alleges only that he is "housed in an illegal cell" and that he sustained "severe insect bites on chest," (ECF No. 19 at 9), although he makes no other allegation about insects or conditions related to insects.  Taking the totality of these conditions together, they do not support a plausible inference that the conditions of Thomas's confinement amounted to punishment, deprived him of a basic need, or otherwise caused him harm.  *See Seiter*, 501 U.S. at 305 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."); *Bell v. Wolfish*, 441 U.S. 520, 542-43 (1979) (double-bunking did not violate constitutional rights of pretrial detainees when detainees had sufficient space for sleeping and use of common areas, and the average length of incarceration was 60 days); *Walker v. George W. Hill Corr.*, Civ. A. No. 18-2724, 2018 WL 3430678, at *3 (E.D. Pa. July 13, 2018) (concluding that prisoner plaintiff's claims that "he was forced to share a cell with two other individuals and that he was forced to sleep on the floor inside what was described as a boat unit" and that "his sleeping area was a very unhealthy and unsanitary space two feet from the toilet bowl" failed to state a Fourteenth Amendment claim with respect to allegations of overcrowding).   Accordingly, the Court will dismiss Thomas's claims against the City of Philadelphia and his official capacity claims for failure to state a plausible claim based on housing Thomas in a multipurpose room.

### B.  Claims Against Doe in his Individual Capacity

Thomas's claims against Defendant Doe stem from the events of December 16, 2020, when sewage water containing urine and feces from the housing unit flooded the multipurpose closet where Thomas was housed.  Thomas alleges that Doe went to lunch, leaving him and other

inmates in the multipurpose closet while it was flooded and that upon his return to the unit, Doe instructed Thomas to clean the sewage water with water from the toilet using towels, a mop, and a bucket, but did not give Thomas gloves or cleaning supplies.  It appears that Doe then served Thomas dinner in the "unsanitary multipurpose closet."  (ECF No. 19 at 8.)

"Inmate exposure to sewage can constitute a serious risk to inmate health and safety and satisfy the objective component" of a constitutional claim.  *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001); *see also Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir. 1990) (observing that "'common sense' suggests that [prison officials] should have had knowledge that unprotected contact with human waste could cause disease").  "At the same time, the frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when considering the objective component."  *Shannon*, 257 F.3d at 1168. However, since "'exposure to human waste carries particular weight in the conditions calculus'" *Martin v. Gearhart*, 712 F. App'x 179, 187 (3d Cir. 2017) (*per curiam*) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)), even relatively short exposures to human waste have been found to violate the constitution.  *See DeSpain*, 264 F.3d at 974 ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." (citing cases)).

Although Thomas's allegations in the Amended Complaint are somewhat sparse, he indicates that the multipurpose closet where he was held flooded with sewage water from the housing unit, that Doe left Thomas and other inmates in the flooded closet for some period of time, and that Doe required Thomas to clean the sewage water using only water from the toilet, towels and a mop.  It is unclear how long the sewage water was actually present in the closet, the

extent of the flooding/contamination, and whether Thomas had physical contact with the sewage water before he was ordered to clean it. Nevertheless, taking the facts and reasonable inferences in the Amended Complaint as true, it is reasonable to infer that Thomas was left in a multipurpose closet that was in some respect flooded with sewage water and then exposed directly to the sewage water from the housing unit when Doe directed him to clean it without gloves or cleaning supplies apart from towels, a mop, and toilet water. In recognition that even brief exposure to human waste can raise health concerns and since Thomas alleges that Doe was personally involved in these events, the Court concludes that Thomas has alleged sufficient facts for purposes of statutory screening to proceed on his claim at this time. *See Roman v. DeMarco*, Civ. A. No. 18-8010, 2019 WL 452736, at *3 (D.N.J. Feb. 5, 2019) (concluding that prisoner's allegations against defendants "to the extent that they left him overnight in a cell flooded with raw sewage and served him breakfast there, while [plaintiff] was deprived of any way to clean his soiled hands, are sufficient to state a claim that [plaintiff] was deprived of the 'minimal civilized measure of life's necessities' under either the Eighth or the Fourteenth Amendment."); *Moore v. Giorla*, 302 F. Supp. 3d 700, 705 (E.D. Pa. 2018) (denying summary judgment as to inmate's claim that he was "covered in raw sewage for approximately eight hours"); *Ellis v. Burris*, Civ. A. No. 16-561, 2017 WL 386233, at *1 (N.D. Ind. Jan. 27, 2017) (concluding that inmate stated a claim based on exposure to sewage when left in flooded cell for six hours and officers refused to clean his cell, since "[u]nnecessarily leaving a person in a cell flooded with raw sewage implicates the Eighth Amendment"). *But see Florio v. Canty*, 954 F. Supp. 2d 227, 235 (S.D.N.Y. 2013) (inmate failed to state Eighth amendment claims when he was "exposed to waste only for brief periods; it appears that his total exposure was less than a few hours"); *Wyland v. Brownfield*, Civ. A. No. 08-1601, 2011 WL 5445305, at *5 (W.D. Pa. Nov. 9, 2011)

("[H]aving to clean a moldy shower with backed up sewage without gloves or a mask on [one] single occasion simply do[es] not give rise to a substantial risk of serious harm or challenge common standards of decency"); *Ortiz v. Dep't of Correction of City of New York*, Civ. A No. 08-2195, 2011 WL 2638137, at *7 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, 2011 WL 2638140 (S.D.N.Y. July 5, 2011) ("[W]here exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions").

### C.  Claims Against Hester in his Individual Capacity

Thomas has alleged the following factual bases for claims against Defendant Hester, who worked the 3 p.m. to 11 p.m. shift on housing unit B1-Pod 2, where Thomas was initially housed for fifteen days: (1) that Thomas was housed in a multipurpose room on this unit without access to showers, phone calls, or legal counsel; (2) that Hester would turn off the emergency call button and leave the unit unattended for several hours; (3) that Hester finished his shift without feeding the inmates dinner, apparently on the December 16, 2020 when the multipurpose room flooded with sewage water.

#### 1.  Showers, Phone Calls, and Lack of Access to Legal Counsel

Thomas alleges that he was denied showers, phone calls, and access to legal counsel for the fifteen-day period that he was housed in a multipurpose closet on housing unit B1-Pod 2. The Amended Complaint indicates that these deprivations were limited to the fifteen days Thomas was held in the multipurpose closet on this unit, apparently on intake.  The Amended Complaint does not clearly allege how Hester was responsible for these conditions or that he was aware of them.  He is identified as one of the Officers who works on the unit, but there are no

factual allegations suggesting that he was personally involved in the imposition of these

challenged restrictions or aware of them.

In any event, courts have held that the denial of showers for relatively short durations is

not a sufficiently serious deprivation for purposes of setting forth a constitutional claim. *Accord*

*Ellis v. Pierce Cty., GA*, 415 F. App'x 215, 218 (11th Cir. 2011) (*per curiam*) (denial of showers

for two-week periods "several times" over a fifteen-month detention did not violate rights of

detainee as he "usually had to wait only three to four days for a shower"); *Fortune v.*

*Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) ("Fortune complained of his inability to

adequately shower and exercise for a period of fifteen days. Although it is not clear how many

times Fortune believes that he should have been permitted to engage in those activities in

addition to the time he was already given to do so, he does not allege that he suffered any harm

as a result of the denial of additional showers and exercise."); *Dixon v. Clague*, Civ. A. No. 20-

4129, 2020 WL 6389855, at *2 (C.D. Ill. Oct. 30, 2020) ("Plaintiff fails to plead a colorable

claim for inhumane conditions of confinement where he was subjected to two one-

week lockdowns and unable to exercise and, for a one-week period, unable to shower."); *Barndt*

*v. Wenerowicz*, Civ. A. No. 15-2729, 2016 WL 6612441, at *4 (E.D. Pa. Nov. 8,

2016), *aff'd,* 698 F. App'x 673 (3d Cir. 2017) (denial of showers and out of cell exercise for

twenty-eight days did not violate Eighth Amendment when plaintiff did not suffer ill effects and

had access to running water in his cell); *Barnes v. Cty. of Monroe*, 85 F. Supp. 3d 696, 738

(W.D.N.Y. 2015) ("To the extent Plaintiff alleges that his inability to shower over the course of

four days constitutes a constitutional deprivation, his claim must fail. Even a two-week

suspension of shower privileges does not constitute a denial of 'basic hygienic needs.'" (quoting

*McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)); *Wivell v. Adams Cty. Adult Corr.*

14

*Facility*, Civ. A. No. 07-1193, 2007 WL 2155726, at *3 (M.D. Pa. July 25, 2007) ("[I]t has been recognized that the denial of showers for two weeks is not a constitutional violation.").  Notably, Thomas does not allege that he suffered any harm as a result of his inability to shower for this limited duration or that he lacked any other means of washing himself or maintaining some level of hygiene.

Additionally, "prisoners 'ha[ve] no right to unlimited telephone use,' and reasonable restrictions on telephone privileges do not violate their First Amendment rights."  *Almahdi v. Ashcroft*, 310 F. App'x 519, 522 (3d Cir. 2009) (per curiam) (quoting *Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994)).  The denial of phone calls for a fifteen-day period does not violate the constitution especially absent any additional allegations about how that denial interfered with Thomas's ability to engage in constitutionally protected activity, including whom he sought to communicate with and whether other options were available for that communication.  *See Aruanno v. Johnson*, 568 F. App'x 194, 195 (3d Cir. 2014) (*per curiam*) (conclusory allegations "concerning [prisoner's] lack of phone access to friends and family" failed to state a claim); *Hargrove v. Santiago*, Civ. A. No. 14-4754, 2017 WL 2869504, at *7 (D.N.J. July 5, 2017) ("Numerous and sometimes stringent restrictions on personal telephone calls by inmates have been upheld as constitutional." (internal quotations omitted)).

Thomas also indicates that he did not have access to legal counsel for the fifteen-day period the he was housed on unit B1-Pod 2, which could be construed as a claim that he was denied access to the courts or an interference with his right to counsel in his criminal case.  This stray allegation is conclusory, as it is not clear what Thomas means, *i.e.*, he does not clarify any or all of the restrictions in place that allegedly prevented him from accessing counsel.  It is possible, but unclear, that this allegation stems from the lack of access to phone calls for fifteen

days.  "Allegations of denial of telephone communication with counsel suggest a 'denial of access to the courts and interference with the Sixth Amendment right to counsel.'"  *Randall v. Cty. of Berks, Pennsylvania*, Civ. A. No. 14-5091, 2015 WL 5027542, at *17 (E.D. Pa. Aug. 24, 2015) (quoting *Richardson v. Morris Cty. Corr. Facility*, Civ. A. No. 06-2340, 2006 WL 3000234 (D.N.J. Oct. 20, 2006)).  However, a pretrial detainee does not have unfettered telephone access to legal counsel, *King v. Quigley*, Civ. A. No. 18-5312, 2019 WL 416490, at *5 (E.D. Pa. Feb. 1, 2019), and access may be satisfied by other means.  *Randall*, 2015 WL 5027542, at *17.  Additionally, "a pretrial detainee alleging a violation of his right of access to the courts must show that prison officials caused him past or imminent 'actual injury.'"  *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 348 (1996)).  Thomas's stray allegation, which does not identify the attorney he sought to contact or any adverse effect on his criminal case or any other legal proceeding, is not plausible since he does not allege that he suffered any actual injury or that his right to counsel was violated.

### 2.  Turning off Call Buttons and Leaving Unit

Thomas alleges that Defendant Hester "would turn off the emergency call button and leave the unit unattended for several hours." (ECF No. 19 at 7.)  "Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners."  *Velez v. Johnson*, 395 F.3d 732, 735 (7th Cir. 2005) (internal quotations omitted).  Additionally, inmates must "be able to communicate with corrections officers in order to summon medical assistance if necessary."  *DuPont v. Skrah*, Civ. A. No. 16-00159, 2017 WL 1160584, at *3 (D. Or. Jan. 30, 2017), *report and recommendation adopted,* 2017 WL 1159723 (D. Or. Mar. 27, 2017).  However, courts have held that "the mere lack of an intercom or call button in a cell, standing alone, does not rise to the

level of a constitutional violation." *Lowry v. Sutterfield*, Civ. A. No. 20-03037, 2020 WL 2950358, at *2 (W.D. Ark. June 3, 2020) (no constitutional violation based on lack of intercom or call button when cells were continuously monitored by officers through a monitor and inmates could make noise or gesture to seek assistance); *see also Smith v. Holder*, Civ. A. No. 17-00117, 2020 WL 40237, at *10 (E.D. Mo. Jan. 2, 2020) ("Courts that have addressed the absence of call buttons in cells have uniformly found that it does not constitute a violation of the Eighth or Fourteenth Amendments."); *DuPont*, 2017 WL 1160584, at *3 (no Eighth Amendment violation based on disabled intercom system where "plaintiff was not deprived of all means of communicating with corrections officers during the time the intercom was disabled or ignored"); *Torres v. Wright*, Civ. A. No. 17-01919, 2018 WL 1175408, at *4 (D. Conn. Mar. 6, 2018) ("Prisoners do not have an Eighth Amendment right to a cell equipped with an emergency call button").

Here, Thomas alleges not only that Hester turned off the emergency call buttons, but that he left the unit unattended for several hours, although it is unclear how frequently this happened. Courts have permitted deliberate indifference claims to proceed when inmates have been attacked by other inmates on unsupervised units or unable to call for help to address a medical issue. *See May v. Higgins*, Civ. A. No. 20-00826, 2020 WL 4919562, at *1 (E.D. Ark. Aug. 7, 2020), *report and recommendation adopted,* 2020 WL 4905833 (E.D. Ark. Aug. 20, 2020) (allowing failure to protect claim to proceed upon screening when plaintiff alleged that "when he feels suicidal or otherwise needs assistance he cannot get help because the emergency call button has been broken for several months, and deputies only come into his Unit three times a day"); *Solivan v. Dart*, 897 F. Supp. 2d 694, 703 (N.D. Ill. 2012) (permitting claim to proceed when plaintiff, who was "was attacked inside his cell and screamed for two-and-a-half-hours without

an officer coming to his aid," alleged that guard did not leave the "bubble," from where he could

not see into cells or hear noises coming from the cells, for three hours and cell doors could be

manipulated by inmates).  In contrast to those cases, Thomas does not allege facts suggesting he

was at risk of assault by other inmates or was unable to seek assistance for an emergent medical

need, nor does he identify any injury that he sustained as a result of Hester's conduct.

Accordingly, Thomas has not alleged facts to support a plausible deliberate indifference claim

against Hester.  *See Winston v. Edwards*, Civ. A. No. 20-566, 2020 WL 7316116, at *13 (E.D.

Mo. Dec. 11, 2020) (no constitutional claim where plaintiff "fail[ed] to allege facts tending to

show that the lack of a call button jeopardized his health or safety"); *Garner v. City of

Philadelphia*, Civ. A. No. 11-5960, 2013 WL 4401327, at *6 (E.D. Pa. Aug. 16, 2013) (no due

process violation based on deactivated panic buttons at CFCF when plaintiff did not "allege that

he required a panic button at any point during his incarceration, nor does he allege that his lack

of access to a panic button caused him injury"); *see generally Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line

from conceivable to plausible, their complaint must be dismissed.").

### 3.  Failure to Feed Dinner

The Amended Complaint alleges that Defendant Hester failed to feed Thomas dinner on

one occasion.[6]  "Because pretrial detainees are afforded at least the same constitutional

protections as prisoners, the Fourteenth Amendment also guarantees pretrial detainees a

nutritionally adequate diet." *Tapp v. Proto*, 718 F. Supp. 2d 598, 621 (E.D. Pa.), *aff'd,* 404 F.

---

[6] The implication in the Amended Complaint is that this event occurred on the same date that the
multipurpose closet flooded.  However, Thomas makes no direct allegation against Hester
regarding Hester's role or participation in the event related to the flooding of the cell.
Accordingly, there is no basis for a claim against Hester related to the flooding of the cell and the
relatedly unsanitary conditions alleged.

App'x 563 (3d Cir. 2010).  Whether the deprivation of food is objectively serious for purposes of establishing a constitutional violation "depends on the amount and duration of the deprivation." *Duran v. Merline*, 923 F. Supp. 2d 702, 720 (D.N.J. 2013) (internal quotations omitted).  Missing one meal does not rise to the level of a constitutional violation, especially when there is no allegation that Thomas suffered any harm from that deprivation.  *See Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) ("The purported deprivation of a single meal is not of such magnitude as to rise to the level of a constitutional violation"); *Flowers v. Dent*, 21 F.3d 1109 (5th Cir. 1994) (upholding dismissal of detainee's complaint and noting that he did "not allege that the 'spoiled' food ever rendered him ill or that the meager quantity of food made him lose weight, much less develop any physical problems").  Accordingly, Thomas has not stated a claim against Hester based on the allegation that Hester failed to feed him dinner on one occasion.

## IV.    CONCLUSION

For the foregoing reasons, the Court will dismiss Thomas's Amended Complaint for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), with the exception of his claim against Defendant Doe in Doe's individual capacity related to the events of December 16, 2020, when sewage water flooded the multipurpose room where Thomas was housed.  The Court concludes that further amendment of the dismissed claims would be futile since the Court has already provided Thomas with an opportunity to amend his claims and clear instruction on what was required to do so, yet Thomas was unable to state a claim after amendment.  *See Jones v. Unknown D.O.C. Bus Driver & Transportation Crew*, 944 F.3d 478, 483 (3d Cir. 2019) (amendment by *pro se* prisoner would be futile when prisoner "already had two chances to tell his story").  An appropriate Order follows, which directs service of Thomas's remaining claim

on Correctional Officer John Doe of the "housing unit B1-Pod 2" so Thomas can proceed on that

claim.[7]

BY THE COURT:


**/s/ Juan R. Sánchez**
**JUAN R. SÁNCHEZ, C.J.**

---

[7] The Court is aware that although Thomas is entitled to service by Court or the United States Marshals Service, *see* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(3), it is unlikely Defendant Doe can be served without more precise identifying information.  Accordingly, the Court will not terminate the City of Philadelphia as a Defendant, so that the City can identify the John Doe officer.  *See Wyatt v. Municipality of Commonwealth of Philadelphia*, 718 F. App'x 102, 105 (3d Cir. 2017) (*per curiam*) ("Now that the City will be a defendant, service on the City itself should be easily effected and the City should take appropriate steps to identify the individual defendants based on the information that Wyatt has provided.")  Once Defendant Doe is identified, the Court will dismiss the City as a Defendant in this case.  If Defendant Doe cannot be identified after reasonable efforts and assistance, the Court will entertain whatever motions for relief the City seeks to bring.